# IN THE OREGON TAX COURT

## DENNEHY
*v.*
## DEPARTMENT OF REVENUE
(TC 2395)

Gregory J. Howe, Portland, represented plaintiff.

Marilyn J. Harbur, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered January 9, 1987.

### CARL N. BYERS, Judge.

Plaintiff is the owner of real property in Multnomah County. His complaint alleges that certain property tax assessment procedures violate portions of Oregon's Constitution and that he is entitled to a refund of a portion of his taxes paid. Initially plaintiff appealed to the Department of Revenue in December, 1983. However, the Department failed to act on plaintiff's petition and after 27 months plaintiff filed in this court.[1]

There is no dispute as to the determinative facts and both parties have filed motions for summary judgment.[2] The parties have filed memorandum in support of their motions and the court has heard oral arguments. With the issues thus joined and illuminated, the court is prepared to render its decision.

Plaintiff's complaint contains four claims. His first claim asserts that the practice of rounding up under ORS 310.090 violates Article XI, section 11, of Oregon's Constitution. Plaintiff's second and third claims are concerned with the procedure for collecting taxes in urban renewal areas and assert that ORS 457.440 violates both Article XI, section 11, and Article I, section 32, of Oregon's Constitution. Plaintiff's fourth claim reiterates the history of plaintiff's dispute on these issues, reasserts error on the part of the taxing

---

[1] ORS 305.560(5) provides that if the Department fails to act on a taxpayer's petition within 12 months, the taxpayer may treat the appeal as denied and bring suit in this court.

[2] By stipulation, the parties have made the contents of the Department of Revenue administrative hearing file part of the record. Those contents contain, among other things, summaries of assessments, tax levies and other public information pertaining to property taxes in Multnomah County.

authorities and alleges entitlement to attorney's fees as a benefactor of other Oregon taxpayers.

The court will first address the major issues as found in claims two and three, which relate to the way urban renewal is financed in Oregon. The method in question is commonly known as "tax increment financing." It was first adopted by the State of California in 1952. The basic idea is that an Urban Renewal Agency sells bonds and uses the proceeds to buy property in a blighted area and to redevelop the area. When the area has been redeveloped, it will have a higher value for property taxation than prior to urban renewal. The property taxes which are attributable solely to the increase in value from redevelopment are then used to pay off the bonds and expenses of urban renewal. Article IX, section 1c, of Oregon's Constitution was adopted in 1960 by the voters approving this method of financing.[3] Subsequently, the Oregon legislature enacted ORS 457.020 through 457.450 to implement the constitutional provision. (1961 Or Laws, ch 554.)

■ A fair understanding of plaintiff's complaint also requires some knowledge of the procedures by which ad valorem taxes are levied and collected in Oregon. ORS 310.050 specifies that taxing units are to levy property taxes as a total dollar amount. After establishing its total budget and deducting therefrom all nontax resources, the taxing unit certifies the total amount of tax dollars required. This certification is made to the county assessor on or before July 15th of each year. ORS 310.060. Upon receipt of the notices of levy, the assessor is then directed to compute a rate of levy as follows:

> "Subject to ORS 310.070, the county assessor shall compute the rate of levy for each tax-levying body by dividing the assessed valuation into the total amount of money proposed to be raised by taxation, and the rate when so computed shall be expressed in the nearest even amount of dollars and cents, per thousand dollars of assessed value, that will produce the amount of money required to be raised." (ORS 310.090.)

■ When there is an urban renewal project within a taxing unit's area, the assessor must determine and certify the assessed value of all property in the urban renewal area prior

---

[3] For a brief history and explanation of tax increment financing in Oregon, see Report of the Joint Legislative Interim Task Force on Urban Renewal Financing, December 1977.

to redevelopment. ORS 457.430. This becomes the certified or "frozen" value from which the taxing units continue to collect property taxes. Taxes derived from any increase in value over the frozen or certified amount are dedicated to paying for redevelopment of the area. ORS 457.440. The taxes for urban renewal are not levied by the Urban Renewal Agency. Rather, they result from operation of ORS 457.440, which directs the assessor to divide only the certified or frozen value into the total amount of taxes levied by each taxing unit.[4] The rate thus derived is based on a lesser amount of value than is actually subject to tax. When the rate is applied to all taxable property in the taxing unit's boundaries, it will produce total revenues in excess of the amounts levied by the taxing units. This excess amount is the amount dedicated to payment of urban renewal development and expenses.

It is disconcerting to find that the enabling legislation, specifically ORS 457.440, does not provide the same procedures authorized by Article IX, section 1c, of the Constitution. Article IX, section 1c provides:

"The Legislative Assembly may provide that the ad valorem *taxes levied by any taxing unit,* in which is located all or part of an area included in a redevelopment or urban renewal project, may be *divided* so that the taxes levied against any increase in the true cash value, as defined by law, of property in such area obtaining after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project. The

---

[4] ORS 457.440(1) and (2) provides:

"(1) During the period specified in ORS 457.450, the county assessor shall compute the rate percent of levy for each taxing body in which all or part of the urban renewal area is located in the manner provided by ORS 310.090, except that the assessed valuation to be divided into the total amount of money proposed to be raised by the taxing body shall include only that part of the assessed value obtained by multiplying the true cash values of all property specified in the certificate or amendment to the certificate prepared by the assessor under ORS 457.430.

"(2) The rate percent determined under subsection (1) of this section for the taxing body shall be extended by the assessor on the county assessment roll for that year against the entire assessed valuation of all the taxable property in the taxing body including the assessed value attributable to the increase, if any, in true cash value of property located in the urban renewal area or portion thereof exceeding the true cash value specified in the certificate or amendment thereto filed under ORS 457.430, although the assessed value attributable to the increase in true cash value was not included in computing the rate percent of levy."

legislature may enact such laws as may be necessary to carry out the purposes of this section." (Emphasis added.)

However, that is not what ORS 457.440 does. Rather than dividing the taxes levied by the taxing units, the method calls for adding to the taxes levied. It appears that this inconsistency comes from trying to fit a California program to Oregon's tax structure.

As indicated above, California was the first state to adopt constitutional and statutory provisions to provide for tax increment financing of urban renewal projects. It is apparent that both Article IX, section 1c, and ORS 457.440 were patterned after the California plan. Incredible as it may seem, it appears that everyone concerned overlooked the fact that California is a rate-based system while Oregon uses a total dollar amount approach. That is, in California, after a taxing unit completes its budgeting process and determines the amount of property taxes needed to fund its operation, the California taxing unit levies its tax in the form of a *rate*. Calif Government Code § 29100 and 29101. This levy rate is extended to all of the taxable property within the taxing unit's jurisdiction. If urban renewal has created value in excess of the frozen value, the levy will produce taxes in excess of those required to fund the taxing unit's operation. Thus, the California procedure calls for the taxes to be divided so that those taxes attributable to value created by urban renewal is allocated to urban renewal. Calif Health and Safety Code § 33670. Under the California provisions, although the taxing units levy the taxes, the urban renewal agency does not have to obtain consent of the taxing units to divide the taxes levied on the urban renewal property. *In re Redevelopment Plan for Bunkerhill,* 61 Cal 2d 21, 37 Cal Rptr 74, 389 P2d 538 (1964). Moreover, if after adoption of an urban renewal plan part of the urban renewal area passes into public ownership and thus becomes exempt from taxation, the frozen value upon which the taxing units base their rates will be reduced. *Redevelopment Agency v. Malaki,* 216 Cal App 2d 480, 31 Cal Rptr 92 (1963).

In contrast, ORS 310.090 requires Oregon's taxing units to levy their taxes as a total dollar amount. It is not the taxing units but the assessor who administratively converts the amount of taxes levied into a rate by dividing the assessed valuation into the total dollar amount levied by the taxing

unit. Thus, it is clear that under Oregon's procedure it is not possible to "divide" the taxes "levied by any taxing unit" without diminishing the amount that goes to the taxing unit. In order to make the program work in Oregon, it is necessary to provide for the collection of more taxes than are levied by the taxing units in order to have funds for urban renewal. This is what ORS 457.440 accomplishes. The problem is that it is not consistent with the constitution.

It is difficult to understand how this failure to recognize the basic differences between California's system and Oregon's system could occur. Oregon's total dollar amount approach has long been accepted and deemed mandatory.

> "A statutory provision relating to a tax levy, the object of which is the protection of the taxpayer and a safeguard against excessive levies, is mandatory. * * *
>
> "* * * * *
>
> "In reference to the statutory requirement that the tax levy must be made in dollars and cents, the legislature might well have had in mind that a taxpayer, in voting upon a proposed levy, would better comprehend the consequences of his act if the amount to be expended for road purposes were thus expressed. If Mr. Citizen is called upon to vote upon a levy of $10,000 for road purposes, there can be no doubt about the matter, but, if a vote is cast for a certain millage, the amount of money to be raised is uncertain in the mind of the voter unless he has definite knowledge of the valuation of the property upon which the levy is made." *Clark & Wilson Lbr. Co. v. Weed,* 137 Or 186, 189-190, 2 P2d 12 (1931).

In view of plaintiff's contentions, the court has examined both Article IX, section 1c, and ORS 457.440 to determine if those laws can be reconciled. The court has concluded they cannot. Article IX, section 1c, is clear and unambiguous. It expressly provides that any "taxes levied against any increase in the true cash value" after adoption of the plan of redevelopment are to be "divided."[5] While ORS 457.440

---

[5] From one perspective, the problem is not with the statute but with the Constitution. That is, it is the constitutional provision which erroneously assumes that taxes are levied as a rate and not as a total dollar amount. Modifying the language of Article IX, section 1c, makes it clear that it is the method of levy which creates the problem. An example might be:

"The Legislative Assembly may provide that *when* the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a

provides for taxes to be levied by taxing units, the taxes so levied are not to be divided. To the contrary, the assessor is directed to compute the rate of levy for each taxing unit so that when the rate is applied to all the taxable property, it will produce *more* taxes than levied by the taxing units. The only way the taxes could be considered "divided" would be if the assessor's actions were considered part of the levy process. It was long ago decided in Oregon that the action of the assessor in extending the taxes on the roll is not part of the process of levying taxes.

> "The extension of taxes on the tax roll and the delivery of the roll, or a copy thereof, to the tax collector, with a warrant attached, is a step in the collection of the taxes, and not in the assessment, apportionment or levy. The law has always carefully distinguished between the assessment, apportionment and levy of taxes, and their collection, and the extension of the taxes upon the roll, or a copy thereof, has always been regarded as one step in the collection." *Waterhouse v. Clatsop Co.,* 50 Or 176, 178, 91 P 1083 (1907).

*See also School Dist. No. 1, Mult. Co. v. Bingham,* 174 Or 540, 149 P2d 963 (1944).

■ Having concluded that ORS 457.440 is not reconcilable with Article IX, section 1c, the final inquiry must be whether the statute is so repugnant to the Constitution as to require it to be declared void.

> "Before a statute is declared void, in whole or in part, its repugnancy to the constitution ought to be clear and palpable and free from all doubt. Every intendment must be given in favor of its constitutionality." *Cline & Newsome v. Greenwood & Smith,* 10 Or 230, 241 (1882).

■ Any answer to this inquiry must begin with consideration of a basic constitutional premise:

> "[T]hat a state constitution does not confer power on the legislature, but is a limitation on power, and therefore it is

---

redevelopment or urban renewal project, *are converted into a taxable rate,* the rate shall be based on the true cash values before the effective date of the plan of urban renewal but shall be applied to all taxable property within the taxing unit's boundaries so that any taxes attributable to any increase in the true cash value, as defined by law, of property in such area obtaining after the effective date of the plan of renewal for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project. The legislature may enact such law as may be necessary to carry out the purposes of this section."

competent for the legislature to enact any law not expressly or impliedly forbidden by the state constitution or prohibited by the Constitution of the United States." *State ex rel Chapman v. Appling,* 220 Or 41, 47, 348 P2d 759 (1960).

Thus, if not prohibited by either the state or federal constitutions, the legislature may enact such laws as it deems appropriate. In this context, it is appropriate to ask then what does the Constitution prohibit with regard to tax increment financing, or, more specifically, what does Article IX, section 1c, prohibit?

It is apparent from the language of the section that Article IX, section 1c, is not intended to prohibit legislative action but rather to approve a particular program.[6]

Does Article IX, section 1c, prohibit the legislature from using a method other than that expressed in that section? By use of the term "may" the Constitution approves one form of financing. This does not exclude all other forms of financing. As noted by the Oregon Supreme Court in *Northwest Natural Gas Co. v. Frank,* 293 Or 374, 381, 648 P2d 1284 (1982):

> "It is axiomatic that in a case of statutory and constitutional construction, this court must give preeminent attention to the language which the legislature and the people have adopted.
> * * *
>
> "The requirement that we give effect to the words of an enactment is doubly applicable when the law in question is a constitutional amendment adopted by the voters. There is no reliable record of what the voters intended beyond the language of the amendment itself. There are no official committees, no minutes, no formal debates. Given the fact that it is the electorate, the ultimate sovereign, which has adopted the amendments to our Constitution, we are slow to go beyond the face of the enacted language into materials not presented to the public at large."

Examining the language of Article IX, section 1c, the court finds no words which indicate an intent that the legislature should be restricted to one method of financing urban

---

[6] As one student notes, in considering whether Article IX, section 1c, prohibits the legislature from using tax increment financing for purposes other than urban renewal, the provision can be seen as "reinforcing" the legislature's inherent powers. *See* 61 Or L Rev 123 (1982).

renewal. To the contrary, the last sentence of the section provides: "The legislature may enact such laws as may be necessary to carry out the purposes of this section." What are the purposes of Article IX, section 1c? It is to provide financing for urban renewal projects from taxes attributable to the increase in value resulting from urban renewal. It is not inconsistent with the purposes of Article IX, section 1c, to use a different method than that contemplated by the section.[7] Instead of dividing the taxes levied by the taxing units, the legislature has provided a means whereby taxes are collected in addition to the amounts levied by the taxing units. These additional taxes come only from the increased value due to urban renewal. This method is consistent with the explanation given to the voters who adopted the amendment in 1960.

■ Finding that ORS 457.440 is not prohibited by Article IX, section 1c, of the Constitution, does the method nevertheless violate the limitations found in Article XI, section 11, of the Constitution? The relevant portion of that section provides:

> "Section 11, Tax limitation. (1) Except as provided in subsection (3) of this section, no taxing unit, whether it be the state, any county, municipality, district or other body to which the power to levy a tax has been delegated, shall in any year so exercise that power to raise a greater amount of revenue than its tax base as defined in subsection (2) of this section. The portion of any tax levied in excess of any limitation imposed by this section shall be void."

The plaintiff does not contend that the levy amounts certified by the taxing units to the assessor violate the above provision. Rather, it is the additional taxes which are collected as a result of ORS 457.440 of which plaintiff complains. If they are levied by or deemed part of the taxes levied by the taxing units, many levies would exceed the limitations set forth in Article XI, section 11. As to those taxes, plaintiff asks: If they are not levied by the taxing units then who does levy them?

Although the term "levy" has been defined in many

---

[7] The legislature could have amended ORS 310.050 and provided for a rate system of levy rather than the amount approach. Such a change would be significant in terms of Oregon's long history of using the amount approach. Moreover, it would make it more difficult but not impossible for taxing units to comply with Article XI, section 11, of the Constitution.

different ways,[8] in Oregon it has been construed to mean "the exercise of the legislative function, whether state or local, determining that a tax shall be imposed and fixing an amount, purpose, and subject of extraction." *Dept. of Rev. v. Co. of Multnomah,* 4 OTR 133, 147-148, (1970). In so finding, this court in *Dept. of Rev. v. Co. of Multnomah, supra,* quoted *Rice v. Shealy,* 71 SC 161, 168, 50 SE 868, 870 (1904), as follows:

> " 'Three things are essential to a tax, as that term is understood by our Constitution: First, the ascertainment of a sum certain, or that can be rendered certain, to be imposed on the collective body of taxpayers; second, a legal imposition of that sum as an obligation on the collective body of taxpayers; third, an apportionment of such sum among individual taxpayers so as to ascertain the part or share that each should bear. * * * The first two acts above described * * * are essentially legislative acts or acts proper directly to the lawmaking functions of government. * * * The third act, namely the apportionment of the whole sum imposed by way of tax on the collective body of taxpayers upon the separate individuals composing that body, is usually an administrative act performed under specific statutory directions * * *.' "

■ Here, there is no simple imposition of a tax by a governmental entity. Rather, a series of events leads to the actual collection of taxes for urban renewal. Determining which legal entity levies the tax for purposes of Article XI, section 11, involves more a process of attribution than identification. *Yamhill County v. Foster,* 53 Or 124, 99 P 286 (1909). In this case, although the urban renewal entity creates the need for the tax revenue and the local tax units levy taxes, which become the measure of the tax to be imposed for urban renewal, it is the legislature's direction to the assessor that must be viewed as the "ascertainment and imposition" of the tax. In these circumstances, levying of the tax is more akin to levying an income tax than a property tax. That is, the statute establishes the standard and means by which the tax is calculated; other events trigger and measure the obligation. The court therefore concludes that for purposes of Article XI, section 11, of the Constitution, it is the state which imposes the taxes in question. This conclusion is buttressed by two facts: (1) Urban Renewal Agencies are not given the power to tax, and (2) taxing units levy their taxes as a stated dollar amount.

---

[8] See for example 25 Words and Phrases, "Levy," at 7-20.

This leaves only the state as the governmental entity levying the tax.

Plaintiff's contentions that urban renewal taxes raised by operation of ORS 457.440 violate Article XI, section 11, rest on the assumption that such taxes are levied by the local taxing units. Since the court has concluded that urban renewal taxes raised by ORS 457.440 are levied by the state, it is the state's tax base that sets the limits. In this case, there are no facts or even any arguments to the effect that a state levy for urban renewal violates Article XI, section 11. In the absence of such, the court must assume that taxes imposed under ORS 457.440 are in compliance with the Constitution.

Plaintiff also asserts that ORS 457.440 violates Article I, section 32, of the Constitution. The relevant portion of that section requires that "all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Plaintiff argues that differentiating between the frozen value and the increase in value due to urban renewal is not a reasonable classification for tax purposes. However, in the court's view, if the selection of blighted areas for urban renewal is a reasonable classification, it would seem that classification of the same subject for taxation is also reasonable. *Foeller v. Housing Authority of Portland,* 198 Or 205, 256 P2d 752 (1953).

The court recognizes that if the state is deemed to be the governmental entity levying urban renewal taxes, it is appropriate to inquire as to whether such taxes conform with Article I, section 32. Taxes for urban renewal are a function or result of the interaction of three factors: (1) assessed values in excess of the certified value, (2) the tax rates resulting from applying the taxing unit's levy to the certified value and (3) the existence of debt or expenses of the Urban Renewal Agency. Consequently, the rate of tax will necessarily vary between urban renewal areas and from year to year. Does this variance in rate violate Article I, section 32? The court believes not.

The constitutional requirement is as to uniformity in taxation, not equality. The purpose of the 1917 amendments to this section of the Constitution was to eliminate some of the severe restrictions previously found therein. *Jarvill v. City of Eugene,* 289 Or 157, 613 P2d 1 (1980). Under the present

standards, it is sufficient if the classification and sub-classifications meet the due process requirements of the Fourteenth Amendment of the federal Constitution.

> "[I]t is manifest that the only limitation imposed upon the taxing power of the several states by the 14th Amendment is this, —all taxation shall be uniform upon the same class of subjects. For all practical purposes, the limitation mentioned is identical with the restriction imposed by the Oregon Constitution [found in Article I, section 32, and Article IX, section 1] upon the power of taxation * * *." (*Standard Lbr. Co. v. Pierce et al.,* 112 Or 314, 333, 228 P 812 (1924)).

■ Moreover, although the taxes imposed may be attributed in this case to the state's taxing power, they are for the benefit of the area subject to the tax. By circumscribing the purpose of the tax, the legislature has met the uniformity requirements of the Constitution.

> "[T]o authorize the legislature to lay a tax upon one district or subdivision of the state alone, the purpose for which it is laid must not only be public, but, as regards the people of such district or subdivision, it must also be local." *Cook v. The Port of Portland,* 20 Or 580, 589, 27 P 263 (1891).

*See also Jarvill v. City of Eugene,* 289 Or 157, 613 P2d 1 (1980). Based on these principles, the court concludes that the taxes resulting from the operation of ORS 457.440 meet the uniformity requirement of Article I, section 32, of the Constitution.

The final issue, raised in plaintiff's first claim, relates to the assessor's administration under ORS 310.090. That statute provides:

> "Subject to ORS 310.070, the county assessor shall compute the rate of levy for each tax-levying body by dividing the assessed valuation into the total amount of money proposed to be raised by taxation, and the rate when so computed shall be expressed in the nearest even amount of dollars and cents, per thousand dollars of assessed value, that will produce the amount of money required to be raised."

The admitted facts in this case are that, when computing a taxing unit's tax rate, the assessor rounds off in every case by rounding up. As demonstrated by the figures contained in plaintiff's complaint, it is necessary for uneven amounts to be rounded to whole cents. When this is done by

rounding up for all taxing units in the county, the cumulative effect *in theory* will produce more taxes than the total amounts levied. Plaintiff asserts that where a taxing unit's levy is at the maximum allowed under Article XI, section 11 of the Constitution, the rounding up results in a levy in excess of the constitutional limit. This latter point is disputed by defendant. Defendant points to the affidavit of Bev Green, the Tax Accounting Manager of Multnomah County, which indicates that not all taxes assessed are collected. Defendant argues that it is necessary for the assessor to round up in order to "produce the amount of money required to be raised."

■ It is not necessary for the court to determine whether rounding up raises revenue in excess of the amounts authorized by Article XI, section 11. Plaintiff cannot prevail on this issue because Article XI, section 11, is a limit on the amount a taxing unit may levy, not on the amount that an assessor may assess or a tax collector may collect. As indicated above, the assessor's actions in computing the rate under ORS 310.090 are not part of the levy process. *School Dist. No. 1, Mult. Co. v. Bingham,* 174 Or 540, 149 P2d 963 (1944).

Having thus determined that ORS 457.440(1) is constitutional and that rounding up under ORS 310.090 does not violate Article XI, section 11, of the Constitution, the court finds that defendant's Motion for Summary Judgment should be granted and that plaintiff's Motion for Summary Judgment should be denied. Accordingly, judgment will be entered dismissing plaintiff's complaint with prejudice. Defendant shall recover its statutory costs and disbursements.

## OPINION ON REHEARING

Petition for Rehearing heard February 3, 1987.

Gregory J. Howe, Portland, represented plaintiff.

Marilyn J. Harbur, Assistant Attorney General, Salem, represented defendant.

Amended decision for defendant rendered February 5, 1987.

## CARL N. BYERS, Judge.

Defendant petitioned for reconsideration of a portion of the court's opinion issued January 9, 1987. Defendant urges the court to reconsider that portion of its opinion, 10 OTR 348 at 357, which concludes that the state levies the taxes for tax increment financing and the state's tax base sets the limits on urban renewal taxes that may be raised. The court granted defendant's petition and has reconsidered that portion of its opinion in light of the arguments and authorities cited by counsel. Upon reconsideration, the court finds that its language and the questioned conclusions are not correct and the opinion should be modified.

■ The problem is one of accurately characterizing the taxes which result from the statute's directions to the assessor. ORS 457.440 directs the assessor to compute a local taxing unit's tax rate based on the frozen (certified) value but to extend that rate against all value within the urban renewal area. If property in the urban renewal area has increased in value over the frozen value, more taxes will be raised than were levied by the local taxing units. Since neither the local taxing units nor the urban renewal agency levied those additional taxes, the court concluded that the taxes are like an income tax and are imposed by the state. The critical question is whether those taxes are subject to the restrictions of Article XI, section 11 of Oregon's Constitution. The language under reconsideration erroneously implies that they are.

In its petition for reconsideration defendant contends that the taxes are not "taxes" within the meaning of Article XI, section 11, and even if they are, they are not subject to that article's restrictions because: (a) they are not "levied" by the state since the state receives no revenue; (b) the funds are constitutionally dedicated to payment of urban renewal expenses; (c) they are in essence a property tax exemption; (d) Article IX, section 1c overrides Article XI, section 11; and (e) the taxes arise from the police power, not the taxing power, of the state and, therefore, are not governed by Article XI, section 11. These many theories reflect the uncertainty associated with attempting to characterize the revenue raised by the operation of ORS 457.440.

While it may seem mere sophistry to say that the taxes in issue are not property taxes, particularly to the property owner who pays them, it is clear that they are not levied in the traditional sense. More significant than the method by which taxes are measured and raised is their purpose. One fundamental distinction to be made in the characterization of taxes are special assessments versus general taxes.

■ "Special assessments are a peculiar species of taxation, standing apart from the general burdens imposed for state and municipal purposes, and governed by principles that do not apply universally. The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed, beyond what may be anticipated from an administration of the laws for individual protection and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and, in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made by the persons receiving it." Cooley on Taxation 1153-1154 (3rd ed 1903).

■ Here the funds in question are not used for the general support of government but are dedicated to the payment of urban renewal expenses. As such, the taxes imposed by ORS 457.440 may be viewed as an assessment for the benefit of a defined area or group of properties. The assessment or levy of these types of impositions have been exempted from

the limitations imposed by Article XI, section 11, of the Constitution. As indicated by the court in *Northern Pac. Ry. Co. v. J. Day Irr. Dist.,* 106 Or 140, 164, 211 P 781 (1923):

"This constitutional provision has no application to the assessment under consideration. We have already referred to the distinction between general taxes for the support of the government * * * and assessments for the benefit of property."

*See also King v. City of Portland,* 2 Or 146 (1865).

The taxes raised by operation of ORS 457.440 would appear to be exempt from the operation of Article XI, section 11 by reason of another characteristic. That is, the amount of the tax to be collected is uncertain until the tax rates for the local taxing units are computed and extended on the roll. Whether an urban renewal agency will receive any funds depends upon whether the local taxing units levy any taxes. In *Garbade & Boynton v. City of Portland,* 188 Or 158, 214 P2d 1000 (1950), the court found that Article XI, section 11 of the Constitution applied only to property taxes. One reason that it found that the provision did not apply to income taxes, excise taxes and similar taxes was because the revenue "could not be ascertained until such taxes have been paid or reported, and, until then, there would be no way to determine whether the amount so raised was in violation of the six per cent limitation." The court found that this "demonstrates the utter futility of attempting to apply it [Article XI, section 11] to any other taxes." (188 Or at 188.)

While there is less uncertainty with regard to taxes raised by ORS 457.440, there is no clear levy which may be determined to be within or without the limitations imposed by Article XI, section 11 of the Constitution.

It is worth noting that the taxes raised by operation of ORS 457.440 are limited in use. Subsection (4) of that statute specifies that such funds shall be:

"[P]aid into a special fund of the agency and shall be used to pay the principal and interest on indebtedness incurred by the agency to finance or refinance the carrying out of the urban renewal plan."

Subsection (3)(a) of section 11, Article XI, of the Constitution exempts from the limitations of that section taxes which are used to pay "bonded indebtedness or interest

thereon." While urban renewal agencies are not limited to the use of bonds as the means of financing their urban renewal plans, the court may take judicial notice of the widespread use of bonded indebtedness for such purposes. Without a traditional form of property tax levy, there is no way to determine which part of the taxes will be used to pay bonded indebtedness and therefore no way to determine whether the limitations imposed by Article XI, section 11, are violated except by an after-tax audit.

In view of the above, the court concludes that urban renewal taxes raised by operation of ORS 457.440 are not subject to the limitations imposed by Article XI, section 11 of the Constitution.

The opinion of the court dated January 9, 1987, is modified accordingly.